[Cite as *In re J.T.*, 2019-Ohio-4520.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

IN RE:

    J.T.,

CASE NO. 14-19-15

ADJUDGED DEPENDENT CHILD.

[LAUREN G. - APPELLANT]

O P I N I O N

IN RE:

    B.T.,

CASE NO. 14-19-16

ADJUDGED ABUSED, DEPENDENT
CHILD.

[LAUREN G. - APPELLANT]

O P I N I O N

Appeals from Union County Common Pleas Court
Juvenile Division
Trial Court Nos. 21730010 and 21730047

Judgments Affirmed

Date of Decision:   November 4, 2019

APPEARANCES:

    *Barbara A. Luke* for Appellant-Mother

**SHAW, J.**

{¶1} Mother-appellant, Lauren G. ("Mother"), appeals the March 22, 2019 judgments of the Union County Court of Common Pleas, Juvenile Division, granting the motion for legal custody of her children, J.T. and B.T., filed by third-party intervener-appellee, maternal uncle, Lucas G. ("Uncle"), and overruling Mother's motion for custody. On appeal, Mother claims that the trial court's decision is against the manifest weight of the evidence and not in the best interest of the children. Mother also claims that the trial court abused its discretion when it failed to follow the recommendations of some of the witnesses at the evidentiary hearing.

{¶2} On March 16, 2017, the Union County Department of Job and Family Services (hereinafter the "Agency") filed a complaint alleging six-month old J.T. to be a neglected and dependent child. *See* R.C. 2151.03; R.C. 2151.04. The complaint alleged that Mother was incarcerated as a consequence of her chronic, illicit drug use and that Mother had failed to provide housing for J.T.[1] After an initial hearing, J.T. was placed in the care of Uncle under the Agency's protective supervision, with Mother having supervised parenting time. The Agency developed a case plan for Mother with the goal of reunification.

---

[1] The record identifies Dillon T. as J.T.'s biological father and indicates Father was incarcerated prior to the complaint being file. We note that Father did not appeal the underlying custody order at issue.

{¶3} On June 5, 2017, the magistrate conducted an adjudicatory hearing and found J.T. to be a dependent child under R.C. 2151.04(A)-(C). The magistrate further found that the Agency failed to substantiate its claim of neglect and dismissed the complaint with regard to that claim. The trial court subsequently adopted and approved the magistrate's decision on J.T.'s adjudication.

{¶4} On July 11, 2017, the magistrate conducted a dispositional hearing and determined that placing J.T. in the temporary custody of Uncle is in his best interest. The magistrate further recommended that the Agency continue its protective supervision with Mother having supervised parenting time at the Agency. The trial court subsequently adopted and approved the magistrate's decision on J.T.'s disposition.

{¶5} On December 27, 2017, B.T. was born to Mother and Father.[2] The Agency sought an emergency *ex-parte* order of temporary custody of B.T. based upon the ongoing case with J.T. Specifically, the Agency alleged that Mother had been out of contact with the Agency from June to September 2017, despite being subject to court-ordered involvement. Mother also had admitted to the Agency that she was using heroin on daily basis during that timeframe. The Agency further alleged that Mother had been living with Father, who also has a history of substance abuse, at the time of B.T.'s birth. The Agency explained that B.T. was initially

---

[2] Dillon T. was legally established to be the biological father of B.T.

released to Mother's custody after birth upon the agreement that a safety plan would be put into effect under which either paternal grandmother or paternal great-grandmother would supervise Mother's and Father's interactions with B.T. at all times. However, upon the Agency's inspection of the home it was discovered that neither family member was present nor was there a crib or appropriate place for the newborn to sleep. The magistrate subsequently granted the *ex-parte* order. B.T. was placed in the temporary custody of Agency, residing in Uncle's home with J.T.

{¶6} Shortly thereafter, the Agency filed a complaint alleging B.T. to be a dependent child. The complaint was later amended to include allegations that B.T. was an abused child pursuant to R.C. 2151.031(B),(D). The allegations of abuse were premised upon two 9-1-1 calls reporting incidents of domestic violence between Mother and Father in December of 2017, and the laboratory results from an analysis of B.T.'s umbilical cord tissue which tested positive for cocaine, benzoylecgonine, opiates and morphine.

{¶7} On March 1, 2018, the magistrate held a hearing and adjudicated B.T. as an abused and dependent child. *See* R.C. 2151.031(D); R.C. 2151.04(C),(D). The trial court subsequently approved and adopted the magistrate's decision on the adjudication of B.T. The following day, the magistrate conducted a dispositional hearing concerning B.T. In a decision issued August 20, 2018, the magistrate determined it in B.T.'s best interest to be placed in Uncle's temporary custody and

continued Uncle's temporary custody of J.T.  The magistrate also recommended that B.T. be placed under the protective supervision of the Agency and that the Agency continue its protective supervision of J.T. for six months, with Mother having supervised parenting time with B.T. and J.T.  The trial court subsequently adopted and approved the magistrate's decision.

{¶8} On August 31, 2018, the Agency filed a motion to modify disposition. In this motion, the Agency cited a concern with "disagreement and turmoil" between Mother and Uncle over the visitation between the minor children and the parents. (Doc. No. 169).[3]  The Agency stated that it was met with resistance from one or more of the parties in attempting to facilitate the reunification of the children with Mother.

{¶9} On September 4, 2018, the magistrate issued a revised parenting time schedule under which Mother was granted incrementally expanded unsupervised parenting time with the minor children and increased overnight visits.

{¶10} On October 19, 2018, the magistrate conducted a hearing on Uncle's and Mother's respective motions for custody of J.T. and B.T.  The trial court also considered the Agency's motion to modify disposition, which it orally amended at the hearing to request that temporary custody be granted to Mother under its protective supervision.  The magistrate heard the testimony of several witnesses

---

[3] When making reference to the record, we will use the enumeration of the docket in case number 21730010 assigned to J.T.

including, Mother, Father, Uncle, Uncle's Wife, and several individuals involved in the Agency's case.

{¶11} On October 23, 2018, the magistrate issued a decision finding it in the children's best interest to grant Uncle's motion for legal custody and to terminate the Agency's involvement. The magistrate recommended that Mother receive local rule parenting time allocated to the non-residential parent, with the exception of Wednesday parenting time, which the magistrate recommended should be reserved for Father's supervised parenting time. Under the magistrate's decision both Mother and Father were to be considered obligors for the children's health insurance and child support. Mother subsequently filed objections to the magistrate's decision, which were overruled by the trial court.

{¶12} On March 22, 2019, the trial court issued a judgment entries granting Uncle's motion for legal custody and implementing orders consistent with the magistrate's decision.

{¶13} It is from these judgment entries that Mother now appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT-MOTHER'S MOTION FOR LEGAL CUSTODY OF J.T. AND B.T. AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT IN THE BEST INTEREST OF THE CHILDREN.**

**ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING [UNCLE]'S MOTION FOR LEGAL CUSTODY OF J.T. AND B.T. AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT IN THE CHILDREN'S BEST INTERESTS.**

**ASSIGNMENT OF ERROR NO. 3**

**THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO FOLLOW THE RECOMMENDATIONS OF EACH PROFESSIONAL IN THE CASE, WHICH IS AGAINST PUBLIC POLICY, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND NOT IN THE CHILDREN'S BEST INTERESTS.**

{¶14} For ease of discussion, we elect to address the assignments of error together.

*First, Second, and Third Assignments of Error*

{¶15} In these assignments of error, Mother challenges the trial court's decision to grant Uncle's motion for legal custody of J.T. and B.T. Specifically, Mother maintains that the trial court's decision is against the manifest weight of the evidence and not in the children's best interest.

*Legal Standard*

{¶16} Pursuant to R.C. 2151.353(A)(3), if the court adjudicates a child abused, neglected, or dependent, then it may grant legal custody to a parent or another person who requests custody. "Legal custody vests in the custodian the physical care and control of the child while residual parental rights and

responsibilities remain intact," and "[u]nlike permanent custody, granting legal custody does not terminate the parent-child relationship." *In re M.M.*, 12th Dist. Fayette No. CA2010-12-034, 2011-Ohio-3913, ¶ 7. The statutory scheme regarding an award of legal custody does not include an independent test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the children. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18; *In re M.A.*, 12th Dist. Butler No. CA2011-02-030, 2012-Ohio-545, ¶ 15. A court may therefore consider the relevant best interest factors set forth in either R.C. 3109.04(F) or R.C. 2151.414(D) as guidance in determining the best interest of the child. *In re K.S.*, 12th Dist. Warren Nos. CA2019-01-009 and CA2019-02-015, 2019-Ohio-2384, ¶ 37; *In re H.S.*, 9th Dist. Summit No. 29011, 2019-Ohio-1878, ¶ 13; *In re A.B.*, 6th Dist. Lucas No. L-18-1136, 2018-Ohio-4206, ¶ 11.

### *Standard of Review*

{¶17} Unlike in a permanent custody proceeding, where an agency's burden is by clear and convincing evidence, the standard in legal custody proceedings is a preponderance of the evidence. *In re S.D.*, 5th Dist. Stark Nos. 2013CA0081, 2013CA0082, 2013-Ohio-5752, ¶ 32; *In re A.C.*, 12th Dist. No. CA2006-12-105, 2007-Ohio-3350, ¶ 14. "A trial court has broad discretion in proceedings involving the care and custody of children." *In re Mullen*, 129 Ohio St.3d 417, 2011-Ohio-

3361, ¶ 14. Consequently, we review a trial court's decision to award a party legal custody of an abused, neglected, or dependent child for an abuse of discretion, and we afford its decision "the utmost deference." *In re E.W.*, 4th Dist. Washington Nos. 10CA18, 10CA19, and 10CA20, 2011-Ohio-2123, ¶ 18, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). "The phrase 'abuse of discretion' is one of art, connoting judgment exercised by a court which neither comports with reason nor the record." *In re K.Q.*, 11th Dist. Ashtabula No. 2017-A-0060, 2018-Ohio-906, ¶ 14.

{¶18} Moreover, in considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

*Evidence Adduced at the Hearing*

{¶19} The testimony from multiple witnesses at the evidentiary hearing established that both Mother and Father had chronic substance abuse problems which resulted in J.T. being placed into Uncle's care in February of 2017 at

approximately six-months old. Mother admittedly did not actively participate in the Agency's case plan concerning J.T. for the first ten months and until after she became clean and sober in August of 2017. The testimony of several individuals, including the Agency's representative and the children's Court Appointed Special Advocate ("CASA"), demonstrated that Mother began to diligently work towards meeting the objectives outlined in the case plan in October of 2017.

{¶20} Amber Conley, the Agency's ongoing supervisor, testified that Mother had completed all aspects of the case plan, had thirty-five negative drug screens since the beginning of 2018, and continued to see a substance abuse and domestic violence counselor. The testimony of other individuals, including the CASA, echoed applause for Mother's efforts to be reunified with the children, which included maintaining consistent employment, stable housing, paying bills, and exercising parenting time with the children. It is clear that Mother's progress over the eight months preceding the evidentiary hearing formed the principal basis for these witnesses expressing their beliefs that Mother's motion for custody of J.T. and B.T. should be granted.

{¶21} However, Uncle also testified expressing concern with Mother's past drug use and skepticism regarding Mother's ability to be drug free. Uncle remained troubled by Mother's continued relationship with Father, which in the past involved chronic substance abuse and alleged incidents of domestic violence. Uncle feared

that Mother would be unable to protect the children if she was granted custody. Moreover, the record established that Father failed to make substantive efforts to work the Agency's case plan, failed to pay child support, did not produce negative drug screens, and was arrested twice since the case with J.T. began.[4]  Mother maintained that she and Father were no longer a "couple"—despite having contact with Father "twice a week at least."  (Tr. at 178, 185).  Mother was also pregnant with her third child at the time of the evidentiary hearing whom she claimed to be the child of Father.  Even though Ms. Conley, the Agency's representative, testified that Mother should receive temporary custody of the children based on her progress, Ms. Conley noted that the Agency would still require Father to have supervised parenting time due to his lack of compliance with the case plan.

{¶22} Mother stated that the last time she and Father were in a physical altercation was in the beginning of 2018.  Karen Bresky, a former CASA assigned to the case, testified that she noticed Mother had a "pretty severely injured face and eye" in February of 2018.  (Tr. at 52).  Mother claimed that she was in a car accident and the airbag deployed, causing injury to her face.  Ms. Bresky stated that she believed Mother was "dishonest about the airbag incident."  (Id. at 57).  However, at the evidentiary hearing over six months later, Mother attempted to rely on her

---

[4] Father testified that he had stopped consuming drugs since he attended a rehab in June of 2018 and was receiving the vivitrol shot and counseling for drug and alcohol abuse.  However, the Agency's caseworker testified that Father tested positive for THC approximately a month before the evidentiary hearing and Mother acknowledged that Father continued to use marijuana.

testimony from a prior hearing during which she stated that her injuries were caused by a car accident, and when pressed on the issue chose not answer any further questions regarding the incident and instead invoked her Fifth Amendment right against self-incrimination.

{¶23} The evidence at the hearing also demonstrated that Mother visited a known drug house in January of 2018 with Father's mother (paternal grandmother) while the Agency's cases were ongoing. Mother admitted to going to the residence with Father's mother, but claimed she was simply there to see friends and did not consume any drugs. (Tr. at 168). The Agency's caseworker verified that Mother had a negative drug screen around this time. Nevertheless when asked about the incident, Father admitted that his mother (paternal grandmother) is "an addict" and speculated that she was at the house with Mother to purchase illegal drugs. (Tr. at 252). Although she downplayed her relationship with Father at the evidentiary hearing, Mother admitted she had "latched on" to Father and his family "whether it's been healthy or unhealthy" and claimed that she has made progress in attempting to reduce that reliance. (Tr. at 187).

{¶24} The testimony from multiple witnesses at the evidentiary hearing, including the Agency's representative, also established that J.T. and B.T. were well-adjusted to Uncle's home and had a close bond with Uncle, his wife, and their children. Furthermore, even though the Agency and other individuals involved in

the case advocated for Mother to be granted custody of the children, they all agreed that it is in the children's best interest for Uncle to have visitation and remain a constant in their lives.

{¶25} The evidence also demonstrated that Uncle followed the court-ordered schedule giving Mother expansive parenting time with the children despite his acrimonious relationship with Mother. Even though Mother alleged that Uncle took the children out of state on Mother's scheduled weekend for his wedding in contravention of the court's order, the record reveals that there was contradicting testimony at the evidentiary hearing as to whether Mother was apprised of this event well in advance of her receiving expanded visitation and whether Uncle offered to compensate Mother with additional parenting time for accommodating them.

{¶26} Mother also claimed that Uncle unilaterally withheld the children from her for a short period of time. However, the record indicates that Uncle ceased facilitating Mother's visitation upon the advice from counsel because there was no court order establishing the parties' parenting times/custody. The record indicates that Uncle complied once the court issued the order. Specifically, Ms. Conley, the Agency's representative, testified that Uncle had "done a nice job" following the court's "aggressive visitation, which I know he wasn't in favor of." (Tr. at 124). Accordingly, the evidence at the hearing did not substantiate Mother's claims that Uncle willfully interfered with her court-ordered parenting time.

*Discussion*

**{¶27}** In rendering a decision, the magistrate and the trial court applied the statutory best interest factors in R.C. 3109.04(F) which provides that:

**(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:**

**(a)   The wishes of the child's parents regarding the child's care;**

**(b)   If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;**

**(c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;**

**(d)   The child's adjustment to the child's home, school, and community;**

**(e)   The mental and physical health of all persons involved in the situation;**

**(f)   The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**

**(g)   Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;**

**(h)  Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;**

**(i)  Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;**

**(j)  Whether either parent has established a residence, or is planning to establish a residence, outside this state.**

R.C. 3109.04(F)(1).

{¶28} On appeal, Mother claims that the trial court abused its discretion in overruling her objections to the magistrate's decision. Specifically, Mother asserts that the magistrate failed to properly apply the best interest factors and argues that the manifest weight of the evidence supported granting Mother's motion for

custody. Mother bases her arguments on the fact that the Agency, the CASA, and the Guardian ad litem all testified in support of Mother's motion for custody. Notably, we disagree with Mother's characterization on appeal that the magistrate and trial court failed to give adequate consideration to the testimony of these witnesses. Nevertheless, we recognize that the undisputed evidence at the hearing established that Mother made significant progress towards reunification in the eight months preceding the evidentiary hearing by achieving all the objectives in the Agency's case plans, remaining clean and sober, and maintaining employment and appropriate housing.

{¶29} However, in stating her position on appeal, Mother overlooks the evidence establishing that she continued to foster a close relationship with Father, who had not made substantial efforts to work the Agency's case plans, had a history of physical violence with Mother, and failed to produce negative drug screens. *See* R.C. 3109.04(F)(1)(e). The record supports the suspicion that Mother was not honest about the nature of her relationship with Father at the evidentiary hearing; specifically, Mother's claims that she was no longer in a relationship with Father and only had limited contact with him, while being pregnant with his child at the time of the hearing. It is apparent from the record that the magistrate was concerned that continuing this relationship with Father could jeopardize Mother's progress— a fact that Mother herself appeared to recognize by attempting to diminish the extent

to which Father remained in her life. Notably, all the principal parties in this case testified including Mother, Father, Uncle, and Uncle's Wife. As a result, the credibility determination of Mother's testimony in this regard was well within the province of the magistrate and trial court as the triers of fact.

{¶30} On the other hand, the undisputed evidence also established that J.T. and B.T. were extremely well-adjusted to Uncle's home and had closely bonded with the family members in Uncle's household. *See* R.C. 3109.04(F)(1)(d),(c). As previously mentioned, J.T. was placed with Uncle at six-months old and B.T. was placed with him as a newborn. Moreover, despite his distrust of Mother and his beliefs about her ability to remain clean and sober, Uncle demonstrated his willingness to abide by the court-ordered parenting time schedule. *See* R.C. 3109.04(F)(1)(f).

{¶31} In deciding whether to grant Mother's motion for legal custody, the trial court also had to consider whether it was the appropriate time to uproot the children from the only home they have known to give Mother a chance to parent fulltime. While Mother had indeed demonstrated a commitment to move away from the lifestyle that caused both the children to be adjudicated dependent and B.T. to be adjudicated an abused child, the assessment of Mother's ability to continue on this path is nevertheless a crucial consideration for the court. *See* R.C. 3109.04(F)(1)(e),(h). It is apparent that in this case the trial court did not find eight

months to be a long enough period of time to substantiate Mother's claims that a change in custody from Uncle to Mother is in the children's best interest. *See* R.C. 3109.04(F)(1)(d),(c). Based on the foregoing, we cannot find that the trial court exercised judgment which neither comports with reason nor the record so as to constitute an abuse of discretion. To the contrary, the record demonstrates that the magistrate and trial court considered the appropriate factors in determining that granting Uncle's motion for legal custody is in the children's best interest. Affording deference to the findings of the magistrate and the trial court regarding the witnesses' credibility, we find ample evidence was presented to support the trial court's determinations that granting custody of the children to Mother was not in the children's best interest at this time.[5] Accordingly, we overrule the assignments of error.

{¶32} For all these reasons, the assignments of error are overruled and the judgments of the trial court are affirmed.

*Judgments Affirmed*

**ZIMMERMAN, P.J. and PRESTON, J., concur.**

**/jlr**

---

[5] Our conclusion is not intended to diminish the fact demonstrated in the record that Mother has made significant progress in working towards reunification with her children, which if continued, could eventually alleviate the trial court's concern regarding Mother's current involvement with Father.